# United States Court of Appeals for the Federal Circuit

06-1080

LEAR SIEGLER SERVICES, INC.,

Appellant,

v.

Donald H. Rumsfeld, SECRETARY OF DEFENSE,

Appellee.

Daniel B. Abrhams, Epstein Becker & Green, P.C, of Washington, DC, argued for appellant. With him on the brief was Shlomo D. Katz.

Marla T. Conneely, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellee. With her on the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; and James M. Kinsella, Deputy Director. Of counsel on the brief was John T. Lauro, Department of the Air Force, Air Force Legal Services Agency, of Arlington, Virginia.

Terry R. Yellig, Sherman, Dunn, Cohen, Leifer & Yellig, P.C., of Washington, DC, for amicus curiae International Association of Machinists and Aerospace Workers, AFL-CIO.

Mark D. Colley, Holland & Knight LLP, of Washington, DC, for amicus curiae Professional Services Council. With him on the brief were David P. Metzger, Kara L. Daniels, and Eric L. Yeo.

Appealed from: United States Armed Services Board of Contract Appeals

# United States Court of Appeals for the Federal Circuit

06-1080

LEAR SIEGLER SERVICES, INC.,

Appellant,

v.

Donald H. Rumsfeld, SECRETARY OF DEFENSE,

Appellee.

---

DECIDED: July 28, 2006

---

Before, NEWMAN, GAJARSA, and LINN, Circuit Judges.

GAJARSA, Circuit Judge.

Lear Siegler Services, Inc. ("LSI" or "the contractor") appeals from the decision of the Armed Services Board of Contract Appeals ("Board"), granting summary judgment to the government and denying summary judgment to LSI. Lear Siegler Servs., Inc., 2005 ASBCA LEXIS 31, 2005-1 B.C.A. (CCH) P32,937, ASBCA No. 54449, aff'd on reconsideration, 2005 ASBCA LEXIS 90, 2005-2 B.C.A. (CCH) P33,110. LSI had claimed that the Price Adjustment Clause (part of the regulatory scheme of the Service Contract Act of 1965) required the government to compensate LSI for increases in the cost of providing its employees with a defined-benefit health plan, as required by the terms of a collective bargaining agreement ("CBA"). See Service Contract Act of 1965,

ch. 286, Pub. L. No. 89-286, 79 Stat. 1034 (codified as amended at 41 U.S.C. § 351-358); 48 C.F.R. § 52.222-43 ("Price Adjustment Clause"). LSI timely appealed.

The Board had jurisdiction pursuant to the Contract Disputes Act, 41 U.S.C. § 607(d)(2), and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10) and 41 U.S.C. § 607(g)(1)(A). For the reasons discussed below, we hold that the Board erred in granting summary judgment in favor of the government, and it abused its discretion in denying summary judgment to LSI. Accordingly, we reverse.

## I. BACKGROUND

The Air Force awarded a firm, fixed price contract to LSI, under which LSI was to provide aircraft maintenance services at Sheppard Air Force Base, Texas. The base year of the contract ran from October 2001 to October 2002, with multiple renewal options thereafter. LSI's predecessor contractor was Lockheed Martin.

LSI's contract incorporated the terms of the Service Contract Act ("SCA"), which serves generally to protect the wages and fringe benefits of service workers. The contract included both a SCA wage/benefit determination, which incorporated the wages and fringe benefits set forth in the CBA between the Air Force and Lockheed's predecessor, and a Price Adjustment Clause, which required the government to pay LSI for "increase[s] . . . in applicable . . . fringe benefits . . . made to comply with . . . [the] wage determination . . . ." 48 C.F.R. § 52.222-43.

LSI's CBA specifically required it to provide its employees with a defined-benefit health plan. As distinct from a defined-contribution plan, a defined-benefit plan obligates an employer to spend whatever is necessary to continue to provide its employees with an agreed-upon level of benefit. A defined-benefit plan thereby ensures

that employees will continue to receive the same level of benefit (here health coverage), even as costs rise. Although the future costs of providing benefits under a defined-benefit plan are not known with certainty at the time of contracting, such costs may reasonably be projected on the basis of actuarial determinations.

In February, 2003, LSI submitted a request for a price adjustment under the SCA Price Adjustment Clause for Option Year 2003, seeking reimbursement for the increased costs of providing its employees with the defined-benefit health plan. The Air Force denied the request, and LSI appealed to the Board. The Board distinguished between increases in an employer's costs of providing benefits, which it deemed insufficient to trigger the Price Adjustment Clause, and increases in the benefits themselves. See 48 C.F.R. § 52.222-43(d) (requiring "increase[s] . . . in applicable . . . fringe benefits . . . ").

Observing that there had been no "change in the CBA . . . [or the] scope of benefits to be provided," it concluded that the CBA-based wage determination did not require LSI to incur the increased cost of maintaining the defined level of health benefit, and that the Price Adjustment Clause was therefore inapplicable. Accordingly, the Board granted summary judgment in favor of the Air Force and denied LSI's request for the same. The Board also rejected LSI's course-of-dealing argument, holding that a course of dealing cannot alter the meaning of an unambiguous contract term. LSI timely appealed to this court, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10) and 41 U.S.C. § 607(g)(1)(A).

## II. DISCUSSION

The principal issue on appeal is whether the Board erred in its construction of the Price Adjustment Clause. For the reasons discussed below, we conclude that it did commit legal error in its determination, and we reverse the judgment of the Board without needing to reach the merits of LSI's other arguments.

A. Standard of Review

This case requires us to review the Board's construction of the Price Adjustment Clause. Our standard of review is governed by the Contracts Disputes Act, which provides that "the decision of the agency board on any question of law shall not be final or conclusive . . . ." 41 U.S.C. § 609(b). Statutory and regulatory constructions are questions of law, which we review de novo. The interpretation of a government contract is also question of law, which we review de novo on appeal. Forman v. United States, 329 F.3d 837, 841 (Fed. Cir. 2003). Nonetheless, we give the Board's legal conclusions "careful consideration due to the board's considerable experience in construing government contracts." Wickham Contracting Co. v. Fischer, 12 F.3d 1574, 1577 (Fed. Cir. 1994). See also Titan Corp. v. West, 129 F.3d 1479, 1481 (Fed. Cir. 1997) ("The Board's interpretation of a contract is not final, and is subject to de novo review on appeal, although due respect is often warranted by the Board's experience in interpreting the Federal Acquisition Regulations (FAR)."); Erickson Air Crane Co. v. United States, 731 F.2d 810, 814 (Fed. Cir. 1984) ("[L]egal interpretations by tribunals having expertise are helpful to us, even if not compelling.").

Summary judgment is properly granted only when there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-

48 (1986). While we review de novo a district court's grant of summary judgment, we review its denial of summary judgment for abuse of discretion. Pickholtz v. Rainbow Techs., 284 F.3d 1365, 1371 (Fed. Cir. 2002).

B. Service Contract Act

The SCA requires most government service contracts to contain clauses that protect workers' wages and fringe benefits. See 41 U.S.C. § 351(a). More specifically, the SCA directs the Secretary of Labor ("Secretary") to issue special minimum wage orders, called "wage determinations," for each class of service worker employed in a particular locality, and it forbids contractors (that is, employers) from paying less than the Secretary's wage determinations. See 41 U.S.C. § 351(a)(1). A similar SCA provision applies to fringe benefits. See 41 U.S.C. § 351(a)(2).

In this manner, the SCA prevents contractors from underbidding each other (and hence being awarded government contracts) by cutting wages or fringe benefits to its service workers:

> Since labor costs are the predominant factor in most service contracts, the odds on making a successful low bid for a contract are heavily stacked in favor of the contractor paying the lowest wages. Contractors who wish to maintain an enlightened wage policy may find it almost impossible to compete for Government service contracts with those who pay wages to their employees at or below the subsistence level. When a Government contract is awarded to a service contractor with low wage standards, the Government is in effect subsidizing subminimum wages.

Fort Hood Barbers Ass'n v. Herman, 137 F.3d 302, 309 (5th Cir. 1998) (citing H.R. Rep. No. 89-948, at 2-3 (1965); S. Rep. No. 89-798, at 3-4 (1965), reprinted in 1965 U.S.C.C.A.N. 3737, 3739).

Although the SCA, as originally enacted, worked well to prevent the depression of wages/benefits (by using wage determinations to set a wage/benefit "floor"), it did not

provide a mechanism to prevent the erosion of wage/benefit gains made through collective bargaining, wherein labor groups had succeeded in negotiating wages/benefits that were higher than the Secretary's general wage determination. As the Fifth Circuit aptly noted:

> [T]he nature of government contracting, calling for frequent rebidding, combined with the SCA's sole emphasis and reliance on the prevailing wage rate scheme, effectively diminished the bargaining power of unionized workforces. A contractor without a CBA covering its employees, or with a CBA setting comparatively low wage and benefit rates, was able to easily outbid an incumbent contractor bound by a CBA with higher wages and rates that would survive the commencement date of the new contract.

Id.

Consequently, the SCA was amended to insert the so-called "successor contractor rule," which prohibits a successor contractor from paying its employees less than its predecessor had paid its employees pursuant to the predecessor's CBA:

> No contractor or subcontractor under a contract, which succeeds a contract subject to this Act and under which substantially the same services are furnished, shall pay any service employee under such contract less than the wages and fringe benefits, including accrued wages and fringe benefits, and any prospective increases in wages and fringe benefits provided for in a collective-bargaining agreement as a result of arm's-length negotiations, to which such service employees would have been entitled if they were employed under the predecessor contract . . . .

41 U.S.C. § 353(c); see also Gracey v. Int'l Bhd. of Elec. Workers, 868 F.2d 671, 675 (4th Cir. 1989) ("[T]he purpose of that section was to remedy the practice of underbidding for government contracts by slashing wages."); see also 29 C.F.R. § 4.163(k) ("No provision of this section shall be construed as permitting a successor contractor to pay its employees less than the wages and fringe benefits to which such

employees would have been entitled under the predecessor contractor's collective bargaining agreement.").

The successor contractor rule is a direct statutory obligation that is self-executing. See Guardian Moving & Storage Co. v. Hayden, 421 F.3d 1268, 1270 (Fed. Cir. 2005) ("[The successor-contractor rule] is a direct statutory obligation and requirement placed on the successor contractor . . . and is not contingent or dependent upon the issuance or incorporation in the contract of a wage determination based on the predecessor contractor's collective bargaining agreement." (citing 29 C.F.R. § 4.163(b))).

Here, LSI is subject to the successor contractor rule because it succeeded Lockheed on the contract and was thus a successor in its base year of the contract. In addition, LSI was also a "successor contractor" during its first option year (the second year it was providing services), because LSI succeeded itself. See 29 C.F.R. § 4.163(e) (stating that a contractor can also become a successor to itself, such as when it, like LSI, performs an additional term pursuant to an option exercised by the government).

C. Price Adjustment Clause

LSI's contract with the government incorporated by reference the provisions of 48 C.F.R. § 52.222-43, including the so-called "Price Adjustment Clause."

> (a) This clause applies to both contracts subject to area prevailing wage determinations and contracts subject to collective bargaining agreements.
>
> * * *
>
> (d) The contract price or contract unit price labor rates will be adjusted to reflect the Contractor's actual increase or decrease in applicable wages and fringe benefits to the extent that the increase is made to comply with or the decrease is voluntarily made by the Contractor as a result of:

> (1) The Department of Labor wage determination applicable on the anniversary date of the multiple year contract, or at the beginning of the renewal option period.

48 C.F.R. § 52.222-43 (emphases added).

Regulations make clear that the term "wage determination" includes a CBA-defined benefit level. See 29 C.F.R. § 4.50 (explaining that there are two types of wage and fringe benefit determinations, namely those that are based on prevailing wage data generally and those based on the level of benefits required pursuant to a CBA that a successor contractor is required to maintain); see also 48 C.F.R. § 52.222-43(a) ("This clause applies to both contracts subject to area prevailing wage determinations and contracts subject to collective bargaining agreements."). In addition, the parties stipulated that the CBA of LSI's predecessor listed fringe benefits that included the defined-benefit health insurance at issue in this case.

D. Analysis

Here we must determine whether a "wage determination" (i.e., the CBA) required an "actual increase . . . in . . . fringe benefits . . . ." 48 C.F.R. § 52.222-43. We conclude that it did, thereby triggering the government's obligations under the Price Adjustment Clause. For several reasons, we find no merit in the argument that the Price Adjustment Clause is triggered only by enlarged benefits rather than enlarged costs of providing those benefits.

First, the language of the clause itself is instructive. See 48 C.F.R. § 52.222-43(d) ("The contract price or contract unit price labor rates will be adjusted to reflect the Contractor's actual increase or decrease in applicable wages and fringe benefits . . . .") (emphasis added). The Clause does not address increases in the nature of the

contract's requirements, but rather the effect on the Contractor, which logically can only refer to changes in cost.

Second, this construction is consistent with other provisions of the regulatory scheme, which provide for the "equivalency" of fringe benefits to be measured not in terms of value to the employee, but cost to the employer. See 29 C.F.R. § 4.177(a)(3) ("When a contractor discharges his fringe benefit obligation by furnishing, in lieu of those benefits specified in the applicable fringe benefit determination, other 'bona fide' fringe benefits, cash payments, or a combination thereof, the substituted fringe benefits and/or cash payments must be 'equivalent' to the benefits specified in the determination. As used in this subpart, the terms equivalent fringe benefit and cash equivalent mean equal in terms of monetary cost to the contractor.") (emphasis added).

Third, this court's precedent in United States v. Service Ventures, Inc., leads to this conclusion. See 899 F.2d 1 (Fed. Cir. 1990). In that case, the applicable wage determination required that employees be given specified amounts of vacation time, depending on their seniority. Id. at 2 (requiring Service Ventures to pay "2 weeks paid vacation after 1 year of service with a contractor or successor; 3 weeks after 5 years"). During the first option year, a greater number of employees were entitled to vacation benefits under the language of the wage determination. Accordingly, Service Ventures had to pay more in order to comply with the mandate of the wage determination, and it therefore sought to receive a price adjustment. Id.

As in this case, the actual language of the wage determination had not changed. Service Venture's obligations had remained nominally the "same" in that it was still required to provide a specified level of benefits to each employee in a specified class.

However, its costs of compliance had changed because of changes in the numbers of employees in each vacation benefit "class." Far from adopting a narrow view of what constituted a "change" to a wage determination, in Service Ventures we held that the "benefits were due entirely to the [wage determination] applicable at the beginning of the renewal option period and were required to be paid in accordance with the [Price Adjustment] clause." Id. at 3.

This case is analogous. In Service Ventures, the employer's costs of compliance changed in a manner not known in advance with certainty, by virtue of changes in the composition of the workforce. Nonetheless, the nominally unchanged wage determination required Service Ventures to pay out whatever total sum of benefits was necessary for it to meet its obligations thereunder. Likewise, in this case, a wage determination (here, from a CBA) required LSI to pay whatever was necessary for it to meet its obligations to its employees, in light of changes in the costs of providing them with an agreed-upon level of health care benefit.

Just as we held such changes in cost to trigger the Price Adjustment Clause in Service Ventures, we hold them to do so here. In short, the Price Adjustment Clause is triggered by changes in an employer's cost of compliance with the terms of a wage determination. The fact that there has been no nominal change in the mandated benefit—i.e., that there has been no change in the level of benefit provided by the defined-benefit plan—is simply irrelevant.

Finally, we address the government's argument that the Price Adjustment Clause does not apply because LSI can somehow satisfy its fringe-benefit obligations by making equivalent payments directly to its employees. See, e.g., 41 U.S.C. § 351(a)(2)

(stating that "[t]he obligation [to provide fringe benefits] . . . may be discharged by furnishing any equivalent combinations of fringe benefits or by making equivalent or differential payments in cash under rules and regulations established by the Secretary"). We see no merit in this argument. If LSI pays its employees the "equivalent" of the fringe benefit, then applicable regulations would require it to pay them an amount equal to its own costs of providing the benefit. See 29 C.F.R. § 4.177(a)(3) ("[E]quivalent means equal in terms of monetary cost to the contractor."). The extent of LSI's CBA-based obligations would remain unchanged.

* * *

For the reasons stated above, we hold that the Board erred in granting summary judgment in favor of the government, and it abused its discretion in denying summary judgment to LSI. We agree with the Board, however, that this case involves no genuine issue of material fact, and it is therefore suitable for summary judgment. Accordingly, we reverse both holdings below and grant summary judgment in favor of LSI.

REVERSED

Costs to Appellant.